to the Fifth Circuit Court of Appeals. We have one case to be submitted today on oral argument. Judge Oldham had an urgent family matter that required his return to Austin. Fortunately, everything is being taken care of. He was unable to be here, but he will be participating, as you can see, and he'll participate fully in the deliberation and decision of the case. And we call now La Union del Pueblo Entero v. Abbott. Mr. Ortner. May it please the Court. Daniel Ortner on behalf of the State Defendants. When Texas enacted SB1, it enacted reasonable, common-sense election security measures that do not deprive disabled voters of meaningful access to the election. And actually, in many respects, expand access to the polls. The District Court erred in enjoining these provisions. I would like to focus my time on oral argument on three issues, three reasons. First, the plaintiffs lack standing to challenge most of these provisions. Second, plaintiffs did not seek individualized accommodations based on their individualized needs. And third, SB1 does not deny plaintiffs members meaningful access to voting based on their disability. There's a lot of provisions in this case. I think it's helpful to group them into three categories. First, the voter assistance provisions, including the oath. Second, the voter ID provisions. And third, the vote harvesting and the paid assistance provisions. And looking at these categories, for the first category, the voter assistance provisions, that category is best resolved on standing grounds in light of this Court's earlier decision, Judge Duncan's decision that you, Judge Smith, joined, that said that plaintiffs do not suffer a recognizable injury from the assistance provisions. It says that their injuries are speculative or fanciful, that they're not traceable to provisions of SB1 itself. Those provisions are best resolved on standing grounds. Second category, the voter ID provisions, this Court could also resolve on standing grounds. The plaintiff organizations don't have an organizational injury under Alliance for Hippocratic Medicine, and this Court's recent SB4 decision really underlines that. And you say could resolve on standing grounds, but if there's no standing, we don't have a choice, right? So, if there's no organizational standing, plaintiff's members were successfully able to vote by mail, they cured their ballots, they can readily comply going forward, and therefore they don't suffer an associational injury. On the third category, the harvesting and paid assistance provisions, the Court should, the most obvious error is that plaintiffs failed to seek a reasonable accommodation or they didn't ask that from local election officials as required, nor in the Court did they point to an accommodation, a modification that they are looking for other than completely throwing out the law as written. And the District Court's injunction fundamentally alters the law, undermines the state's compelling interest in finding, preventing voter fraud, as this Court found in the recent, it's a recent decision in this case on the First Amendment. This law satisfies, these provisions satisfy a compelling governmental interest of preventing voter fraud and simply throwing them out for all voters throughout the state fundamentally alters the law that the legislator enacted and is unreasonable, is not a reasonable accommodation to the ADA. So, looking at each of those categories again, I want to focus on standing for the oath and assistance provisions. Just to draw the Court's attention again to Judge Junkins and Judge Smith-McKinnon, you joined, about the speculative and fanciful fears. The other, my friends on the other side tried to say that this is different because of the nature of an ADA injury versus other VRA injury, but the Court's reasoning there was based on the speculative nature of the injury, and that doesn't change based on the nature of the claim. That is consistent here. You have the same plaintiffs, same facts. It's an easy decision to follow the logic of that earlier decision and find that there's no standing to challenge those provisions. With the voter identification provisions, again, alliance to the Hippocratic medicine is clear. Diversion of funds does not provide standing, and this Court just highlighted that in its recent SB4 decision. And the members, there's weeks of trial transcripts and testimony, thousands of pages of documents and evidence, and the plaintiff organizations cannot point to members that are likely to be affected, likely to be deprived of access to the voting moving forward. The burdens that they suffer having to just provide an ID number that you have access to on a form is not the type of injury that has been traditionally recognized as a recognizable injury. It's the normal burdens of voting as this Court has identified in its past decisions. Council, we're going to hear from your friends in a few minutes about Ms. Iglesias, and they're going to say, based on that one voter, we should be able to officially enjoin a duly enacted statute of the state. So I'm curious what you think about Ms. Iglesias and the perspective relief they ask on her behalf. And then the second part of the question real quick, just to get them both out so I don't have to interrupt you, they're also going to say it's not just Ms. Iglesias. We have all these record sites on page 40 and 41 of the red brief where we say it's not just, you know, especially in the 2020 or 2020, the first rollout, 2020, 2022, whatever it was, it was a disaster and everybody was struggling and rejected ballots and the team database is bad. So that's a two part question. I'm curious your response. Yes. Thank you, Your Honor. So Ms. Iglesias, as I mentioned, they have weeks of testimony, thousands of pages, there's a single voter that they point to that didn't have her ballot counted in one election, but it's because she did not put her number on the ballot. She had access to the number. She could have put her information down, but missed a spot to do so or did not do so successfully. And she in her depositions on page 33558 of the record expressed that she now knows what she did wrong and in the future would be able to better able to comply with the requirements. Going to the larger sample here, the March 2022 election, I think the record is clear, was a difficult rollout. This bill was enacted in December, had to be November or December period in a special session, had to be rolled out for a March election. The primaries are especially difficult in Texas because they're controlled by the parties. But by the time the November election came around, the rate of rejection statewide was 2.7%. In some counties like Bexar County, the number was actually lower than in previous elections of rejections. And that shows that plaintiffs, members, and disabled voters throughout Texas are able to successfully comply with these requirements. This is just an ID number you have readily available. The states made numerous cure methods. The online ballot tracker for some, you can fill out a new registration form if your numbers are not already in the system. They get the numbers in the system. They give these to every voter if their ballot, if their ID doesn't match. And there's inserts that the counties have created, colorful inserts, detailed inserts telling you step-by-step what you have to do. They're trying to make this as easy as possible. They spent millions of dollars also on the Secretary of State and the counties on advertising, promoting what you have to do. And the record shows that most voters are able to successfully complete, successfully fulfill these requirements, including all the members that plaintiffs point to as injured. They all have the ID number. They're all able to do so in the past. Sorry, in the future, whatever might have happened, an unusual occurrence in one election, that they're able to successfully complete these requirements in the future. And that really goes also to the merit. It goes to standing, and I think it also goes to the merits. Because the standard under the ADA is you have to show a denial of reasonable access to a government service. And whether you view that as election as a whole, as we believe is the right framing, or you narrow in on voting by mail, when you have a 97% success rate with readily accessible ID information that everyone has, it's impossible to say that it deprives voters as a whole of reasonable access. The district court there to try to consolidate all of these different disabilities and different needs into one and kind of aggregate them to say there's lack of meaningful access. But that's not how the ADA works. The central requirement of the ADA is a request for an accommodation, an individual need, and an individual response from government officials. And that's a real problem for the plaintiffs here as well with the ID provisions. They don't point to what accommodation they want, other than just getting rid of the law wholesale, saying that no one has to put their ID information throughout the state of Texas. But there's, you know, different disabilities might have different accommodations that they could benefit them. For instance, if there's a hard of sight voter, the font might be small, they could ask for the information to be read over the phone by counties, which they did, assisting voters in filling out the information, they could ask for larger font forms, like the inserts that the counties prepared, spelling out what they have to do to comply. Those are the kind of accommodation requests that the ADA is focused on. Not simply eliminating wholesale provisions of law that are enacted by the legislator for election security purposes. So that's not the proper standard there. And the district court erred, I think, in several respects there. One, in not demanding a request for an accommodation. And even if, you know, the open and obvious theory applies, and we don't believe it does in light of this court's case law. For instance, Judge Smith, your opinion in Pickett v. Texas University Health Science Center, there's a student case, but it says you need to have individual requests to the right party that can provide those requests. So this was a student, and he mentioned maybe to the professor some needs, but he didn't ask the office at the university that could provide accommodations. And the court said, no, you have to ask the right government officials who can provide the accommodation, and they have to have that process of suggesting an accommodation, and they can respond to that. So none of that happened here. Most of the counties, their officials, when they testified, said no one asked for accommodation requests. A few had, maybe I think Harris County had a dozen requests for any kind of accommodation, and many of them they provided. For instance, Cameron County officials took the Secretary of State's advice and actually went to Holmes to help cure ballot mismatches for the ID provision. While you have time, would you address why, in your view, there's no standing as to the compensation and vote harvesting provisions and why we should not reach the merits of those? Sure. So this court has held that there is an injury to these organizations due to these provisions, and it's passed a decision in this case, but that doesn't mean it's a type of injury that's cognizable under the ADA. There's a mismatch here. These organizations are not disabled. They're not denied the ability of access to the polling place, and the ADA is for individuals to have access to government services, and that kind of also flows into the merits as well. The district court never made a filing. Counsel, can we pause? I want to make sure we do standing first. Of course. So I was very surprised. Your friends on the other side two days ago filed a 28-J letter, the first sentence of which says, no aspect of this appeal turns on organizational standing. So I take it that organizational standing is the hook that they need for the provisions that Judge Smith was asking about. Yes. But then it seems that they're disclaiming organizational standing in a 28-J letter. It is surprising. That's really the only basis they relied on for these provisions. What I was going to point to is that the district court in its opinion doesn't make any findings that any voters are actually going to be deprived of the right to vote based on these provisions. Some voters might want to have paid assisters, or they might want to have people come to their home to do ballot harvesting, but there's no evidence in the record that anyone is actually going to be deprived of voting access based on that. Well, that would go to associational, right? Whether they have a member who's going to have a problem. But I understood that what we're talking about with respect to Judge Smith's question is there is testimony in the record and findings of fact from the district court that these plaintiffs or some of these plaintiff organizations pay people to harvest ballots and pay people to assist voters. And so it's injuring them, it's pocketbook injury as to their organizational desires to harvest ballots. Yes. And that's what this court has previously found. And the issue though is, is that the kind of injury that can be remedied under the ADA when there's no evidence that any disabled members are going to be actually denied access to the vote based on it? So whether that goes to standing or you can look at it as a merits fact as well, the lack of a finding that anyone depends on these services exclusively to vote, doesn't have other options, is I think fatal, both on the merits on injury and, and, sorry, both in standing on the injury and merits here. There are no voters that they've pointed to that if they don't have paid assisters are not going to be able to vote. That doesn't exist in this voluminous record. The fact is most people use family members or caretakers that are exempt from this requirement and they're able to vote. And as this court has said, you know, the injury, the need to fill out a form or make an oath that is just consistent with the existing law is not a recognizable injury. So the plaintiff members can never make the connection between their organization impact and depriving meaningful access to the polls. And that's ultimately just in closing here, what the title two of the ADA is about. It's for individuals have access to government services that requires requests for accommodation. It requires a tailored remedy that meets individual needs. Plaintiffs have just tried to aggregate injuries and ask for the whole law to be thrown out. That's not proper under the ADA. And for those reasons, this court should reverse the district court's erroneous decision. You saved time for rebuttal and without using any of your rebuttal time, just on the court's time, are you able to give us a general feel for what is happening with the other provisions of SB1? Here we're dealing with nine different provisions of SB1. I mean, if you don't know off the top of your head, I don't want to take a lot of time. I'm just more curiosity than anything else. What's happening with the other provisions of that statute? Sure. I mean, this court has dealt with, on appeal several of the related challenges. I think that they've ruled in the state's favor and against the district court's decision in all, in those other appeals. Most of the provisions are operative right now and working in the recent November election. There wasn't a large wave of rejections and some of the fears that kind of speculative fears of large numbers of disenfranchised disabled voters just didn't come to pass. And that shows, I think, the lack of injury here. It's based on speculation and not based on the facts on the ground. All right. You've saved time for rebuttal. Yes. Thank you, Mr. Gore. Thank you, Your Honors. Good morning, and may it please the court. John Gore for the intervener appellants. To date, this court has reversed the district court in all six appeals in this SB1 litigation. The court should again reverse because the district court erred in adjoining in their entirety nine provisions of SB1 under the ADA in Section 504. First, as a prior panel of this court held, appellees lacked standing to challenge the revisions to the voter assistance oath and the amended disclosure requirement. For the same reasons, appellees also lacked standing to challenge the identification requirement. Second, appellees' claims fail on the merits for two reasons. For one thing, the challenge provisions do not deny disabled voters meaningful access to voting. And for another, appellees' members never made any request for any specific reasonable accommodation from election officials. And third, the district court's overbroad injunction, which prohibits enforcement of all nine provisions in their entirety and reverts the state to pre-SB1 law, is not a reasonable accommodation. It fundamentally alters Texas' voting program and it exceeded the district court's Article III power. Now, as I mentioned, and as counsel already went through a prior panel of this court already concluded, that these same appellees advancing these same theories on the same record lacked standing to challenge the oath provision and the assisted disclosure provisions. And for the same reasons that panel identified, they also lacked standing to challenge the identification requirement. They lack associational standing because they cannot identify an individual member who faces certainly impending injury as required for issuance of an  We've talked a little bit today about Ms. Iglesias, who had her application rejected because she failed to include an ID number. But that single episode does not establish a certainly impending harm to Ms. Iglesias or anybody else. She testified that she now has more knowledge about how to vote by mail and will be better able to comply with that requirement in the future. And Texas law provides numerous cure opportunities. Election officials offered cure opportunity to Ms. Iglesias, but she declined to exercise it. Now, the appellees also mentioned in their brief two other members who allegedly had to do, quote, additional work to, quote, overcome the requirements barriers. But they don't explain what that additional work was, so it cannot establish standing. That's especially true if that work was filling out the ID number on a form. That's a usual burden of voting and not a cognizable injury. It also cannot be that the additional work was using the cure process, which alleviates rather than causes any alleged harm from the requirement. Now, appellees also prognosticate that some number of voters will fail to meet the identification requirement in the future and choose not to invoke the cure process. But even if that were true, that prognostication doesn't prove that any of their members have standing and face a certainly impending injury, let alone that any voters with disabilities do. There's also no organizational standing to challenge the identification requirement. The district court never found that there was. And all they offer now is a diversion of resources theory foreclosed by the Office for Hippocratic Medicine. So to the extent that the court addresses the merits, it also should reverse. First, their claims fail because they cannot show that any of the challenged provisions have denied any voters with disabilities meaningful access to  Texas law provides... Mr. Gore. Sure. Mr. Gore, I'm sorry to interrupt, but is the position of the intervener defendant that we should reach the merits on the compensation in vote harvesting? That was our position at the time of the briefing in light of Loop A3. But I think in light of the 28J letter that was issued last week, I'll let counsel obviously speak to that. But if they've waived any organizational standing theory in this case, then there would be no standing with respect to those provisions because there's no associational standing with respect to those provisions. So the only standing argument there is the Loop A3 organizational one. And so I just want to make sure we're all on the same page about those  I think it would seem to be the two that on your side of this argument, that the two I'm referring to, the paying the voter assisters and then paying the vote harvesters. That's correct, Judge Oldham. But if the court nonetheless reaches the merits, it also should reject the  Texas law, viewed holistically, provides meaningful access to voting for voters with disabilities. It provides a host of ways for disabled voters to vote, including options like curbside voting that aren't even available to non-disabled voters. Even mail voting is limited to narrow categories of voters. And disabled voters are among the most significant beneficiaries of the mail voting privilege. They failed to identify even a single voter who was unable to vote in Texas because of the challenge provisions. And all their voters testified at trial had successfully voted. Now, the evidence that these voters with disabilities successfully access voting proves that the state provided them meaningful access to voting. The district court tried to brush all of that aside, citing this court's decision in Luke. But Luke was a totally different case. Luke was a case where the defendant failed to provide an interpreter in a court proceeding and then argued that that was no harm, no foul because the disabled individual got a favorable result from the court proceeding. That would be like saying a state had denied individuals with disabilities of the right to vote entirely, but that was okay because their preferred candidate won the election. What we have here instead is something quite different. We have a set of rules that allowed, under which disabled voters were allowed and able to vote, and that proves that they had meaningful access to voting. They also try to redefine all the relevant program as mail voting, but all the cases they cite, including Lamone from the Fourth Circuit, involve universally available programs. In any event, even if the program is mail voting, Texas law provides meaningful access to voters with disabilities. It includes them among the narrow categories of voters who are eligible for this privilege, and SB1 actually expands on mail voting convenience for disabled voters by enacting the anti-discrimination mandate, adopting a cure process, and deemphasizing signature matching. Moreover, the claims fail on the merits because their members failed to request specific accommodations, and I'd like to walk through a few of the factual assertions they make and the district court credited that are not supported by the record. So, for example, they cite to Ms. Halverson, but Ms. Halverson, in fact, directly testified she did not request an accommodation. She merely had questions about whether her polling place had remote controls, and it did. Ms. Nunes-Landry also did not request an accommodation. She sought legal advice from election officials. Ms. Saltzman also did not request an accommodation. She said she needed help, which officials provided. The district court also misstated the testimony when it said the county officials received accommodation requests and were told by the Secretary of State to just read the statute. That's not what those officials testified. Ms. Longoria testified her office got calls about how to cure noncompliance with the identification requirement. Ms. Callinan said she received requests for assistance, but not specific accommodations. Mr. Scarpello also got questions about what the law required. Ms. Phillips' office did deny an accommodation, but the request there was that officials come to voters in their homes or pick them up and transport them to the polling place. There's been no showing here that those requests would have been reasonable. Now, on the law, the district court also erred on the failure to request specific accommodations. The district court concluded that requesting an accommodation would have been futile because it read state law to foreclose election officials from granting accommodations. But that's just a gross misstatement of state law. SB1's anti-discrimination mandate preserves the right to request accommodations, and the ADA itself guarantees the right to receive them. The election code's prohibition on waiving voting requirements does not And the district court's reading of state law simply proves too much, because the record is replete with examples of election officials granting accommodations. All of those would have been admissions of liability under state law if the district court were correct that state law prohibits granting accommodations. They also argued that the breadth of their claims exempts their members from accommodation request requirement, but that would just allow pleading around this request by not mounting broad challenges. And none of the cases they cite support that. They cite a handful of systemic cases, what they call on page 67 and 68 of their brief. But all of those cases involved accommodation requests, including several that were requests for zoning variances to build disabled housing or facilities to serve people with disabilities. Finally, on the injunction, it's overbroad. It alters the state's voting program fundamentally, and it reverts Texas to a pre-SB1 regime that both this court and the state had determined was not secure. So for all these reasons, we ask the court to reverse. Let me ask you a question on the court's timing. I should have asked Mr. Ortner, and I will certainly ask Mr. Savitsky. It's a timing question. Given the status of the injunction, does it matter or not for the upcoming runoffs that are in three and a half weeks as to whether we've issued an opinion in this case, or is it too late? Does it matter? That's kind of a general far-ranging question, but I just want to get a feel for what effect, if any, this has on the May 26 runoffs. Yeah. The injection has currently stayed, so it has no effect on the runoffs. All right. Okay. Thank you, Mr. Gore. Mr. Savitsky? May it please the court? Ari Savitsky for the appellees. Your Honor, SB1 was a sprawling election security bill. Over 90% of its provisions are not touched by the order on appeal here. A small subset of them are what is at issue here. It's a subset that targets voting elements that are designated for use by disabled voters that were implemented in a way that placed stumbling blocks before those voters and violated the ADA. So this was an implementation failure by defendants who had an affirmative obligation to make voting accessible, as this court has said again and again, and who sat on their hands when it came to rolling out these provisions. So there are a lot of different issues to work through here. Justiciability, the merits, the remedy. I want to take them in turn. I want to talk about them as they apply to each of the three different buckets of claims that we have here. Brief overview on justiciability. I think at least as to some of those buckets, you need to get past justiciability to the merits. Obviously, different panels of this court have spoken to the justiciability question on different claims relating to some of these provisions, but at least on some of them, I think even just applying the path of least resistance, you get to the merits. On the merits, you affirm because the district court's fines, in fact, were not clearly erroneous. And actually when you drill down and you look at the story of someone like Ms. Iglesias, what she experienced, her inability to vote in this case, it looks a lot like a pretty standard ADA claim under the law in this circuit. She was not able to access voting. She has to vote by mail and barriers were placed in her way to the implementation of these provisions. We'll talk about that. And finally, on the remedy, I don't want to spend any time today defending the full breadth of this  I want to talk about affirming on liability and remanding for a remedy that is narrower, but that gives disabled Texans the relief they need. This is about making sure there is access for voters with disabilities in Texas to Texas voting programs. And it was wonderful to hear my friend on the other side, talk about all the different things that the secretary could do to make voting more accessible. Let's have a remedy here. Let's have a remedial order that puts some of those into effect, but we need to affirm on liability and then remand for that so that there's some injunctive order, some relief in place that targets the voters that really need it and that deserve it under the ADA. So council, I think that's a very helpful way to start. So I take it. You're abandoning a statewide facial injunction against the number matching provisions based on Miss Iglesias testimony from 2022. So, yes, I think, I think, well, let me just give, give you a yes to that. I think we've been having an interesting conversation about as an intellectual matter, Trump the Casa and can you provide relief to everyone because, you know, based on the need to give relief to the members of the organizations, but I don't want to spend time doing that today. Yes. For purposes of your question, I think we are looking to for the court to affirm on liability and then remand for a narrow remedy. I think that's a realistic way to resolve this case because I think everyone agrees that there are thousands of eligible voters, including folks, visual impairments who cannot access this tiny box with confusing directions on the mail ballot form who could use modifications that the secretary has, was well aware of, received phone calls from everyone from voters to the counties, counties asking to change the care process and make it easier. Even the federal department of defense, the, their voting assistance folks, this is, I think on page 40 of the district court's opinion called the, the secretary to say something's going on here with this, with this rollout. So I think there's, there's no question that we need an injunction that's going to fix this problem and something narrower. We are, we are, we are asking this court to remand for that or to fashion its own relief after affirming on liability. It's not actually obvious to me at all that you can, I mean, most of it's, it's interesting. It's kind of a slippery way that you're putting it because a lot of what you're saying is obviously true. And I think everybody in the courtroom agrees, but then it doesn't necessarily follow. It's a total non-sequitur that you need an injunction to do that. For example, the intervener's brief points out at great length that there are all sorts of different provisions in, in the voting law, in a Texas election law, both before and after SB1 that impose obligations to accommodate disabled voters. That doesn't mean that you need an injunction against any particular provision. That just means that you get accommodations as you always have and as you always will. Well, so we're looking for an injunction against the defendants and the way that they've enforced the, to be clear, it's not, I wouldn't view this as a, as a, as a facial constitutional challenge. It's an ADA claim against these defendants based on their enforcement of these provisions. And so, and I think that's an important, an important distinction. And I just, to get back, I don't know if you want me to address the merits first or to talk about the standing issue. I have a particular question, which I was floored when I read your 28J letter from April 28th. Because, you know, it's, it's, it's interesting to me in two different ways. Number one, you want to rely on loopy three, at least I thought you did. So let's get to that in a second, but I thought you wanted to rely on loopy three, the judge Duncan opinion, to say, well, there is standing as to the, what I call the offense provisions, but that's the vote harvesting and the voter assistance, the stuff that your clients are paying people to do. But then you don't want to rely on loopy three for the parts that hurt you because you say, well, that was a section 208 VRA place and that's very different than ADA. So it strikes me. Number one, you can't have it both ways. And number two, I don't know how to read what you sent us as anything short of a straight up explicit, adamant insistence on waving whatever arguments you have about organizational standing full stop. It literally says, quote, no aspect of this appeal turns on organizational standing. You go on and say a bunch of stuff. And at the end, but in any case the court need not reach that issue to determine the plaintiffs standing here. So, I mean, it's your case, right? You're the plaintiff and you don't want us to do it. So let me, let me clarify that. And I apologize for any imprecision in the 20th jail letter, which, you know, as I understood it was about the United States of Texas case. So no part of this appeal and no part of the state issue turns on the organizational standing issue. And by that, I mean, the Havens diversion of resources type standing. It was an issue in the on bond decision and, and it was discussed in everything. And that issue, I think, you don't need to resolve that at all to get the standing. I do not mean to say that we're waving any argument under Lupe three about the organizational injury of direct regulation of these organizations through criminally prosecuting them. And again, the court in Lupe three was very clear. There's a credible fear that they'll be prosecuted directly as organizations and their staff are prosecuted. So that, that is direct regulation. That's not diversion of resources. And I, I, I certainly don't mean, you know, if I could just, Do you have Lupe three in front of you? Do you have the opinion? I have it up here, your honor. And I'll do my best to answer the court's questions. Sure. So, cause it's interesting to me. I've got it too. And I am reading the part that is most helpful to you where, where judge Duncan for the, for the panel says, look, you know, as to these comp what he calls the compensation provisions, there's article three standing, but in the paragraphs, there are one, two, three, four paragraphs where he addresses this. He says over and over the Harris County, DA right. Harris County DA argues that there's no standing credible threat. We disagree the traceability addressability as to the district attorney. Remind me which district attorney did you sue in our case? And in our appeal, what DA is in front of us? In this case, the only defendant on these claims is the secretary of state. And what could the secretary of state do to prosecute you for anything? Or I guess actually you're, this is another problem. You're not obviously affected by any of this, but the individual voters or the whoever. No, you're right. And how can the secretary of state prosecute? So this gets to the point, there's the organizations who have injury and the question for justiciability purposes, for those that bucket the sort of compensation restrictions is the traceability question. And, and, and I acknowledge in the traceability question was addressed in loop before the December 31st, 2025 opinion. And the court said, yes. And, and the court said that on the ex parte Young analysis, there isn't compulsion or restraint. And I think that is the, that is the hurdle that we would have to get over. I think the traceability analysis for article three standing is a little different. The district court's finding is that the secretary of state is a gathering point for evidence that would be used by any prosecutor. And I think that is sufficient given the secretary's role and given the finding to say that the injury from that credible fear, which again, the article three injury we have based on loop three, the traceability issue, I think we can get there because of the district court's finding that the secretary of state is the one who's gathering the evidence. And if you don't agree, then justiciability takes, takes away our claim there. I agree. That's, that's the justiciability. That's where the rubber meets the road. I'm happy to get to the other. But I just want to make sure I, I want to make sure I understand what you're saying on injury. So you're saying that we find injury as to the compensation provisions based on loop three, notwithstanding the fact that that's a section two, a VRA case. So we can use the injury determination in a section eight, two, a VRA case here under the ADA. You, you could do that. And I understand your honor's point that, well, we have to take the bitter with the sweet and the injury doesn't, the injury didn't suffice for then the six Oh three, the oath related provisions. And again, I would point the court. We pointed the court to this in the 28 day letter. Look at the district court's finding on page 81 of its opinion, because there's a, there's a finding there that is not discussed in loop three at all. And I want to focus over it. That's direct regulation. In other words, the oath provision tells the voters of disabilities themselves, it's not about their fear of someone to be prosecuted. It tells them you must make an attestation to this other person about your eligibility and the findings by the district court at pages 54, 55, 56. And the voters understood that to mean they have to disclose their personal medical information. They've disclosed private information. District court credited testimony from a disabled person saying, I find this offensive. So that is the kind of direct regulation sounding in an injury about privacy and dignity that, that comes within the sort of traditional type of article three injury under transunion. So I would just point the court there. We also have a legal argument in our brief that you're alluding to. It is a different type of injury, ADA versus 208. ADA is broader, but I point the court to those facts. That's our best distinguishing argument, but I take the point that on, on loop a three, the path of least resistance would also be resolving on just disability there. On the other hand, with respect to the number of matching provisions, you look at the court's decisions in United States, Texas, and then in loop a four, I'm sorry, United States and Paxton in loop a four, where the court said that those are traceable to secretary, the secretary designs that little box, the secretary designs and writes the instructions that were so confusing for voters with visual impairments and cognitive impairments. And so those decisions say we get past standing. And the only argument I hear from my friends on the other side is, well, yes, and Mr. Iglesias, you know, her vote wasn't counted, but it won't happen again in the future. First of all, you look at the district court's opinion page 42, it's two elections, not one. And I want to point the court to its decision in Crawford v. Hines County, because I think that decision is, is right on point. This is a case about a voter, a Hines County courthouse was inaccessible. He had been called for jury duty twice over the course of 10 years. And the court said that voter has standing to seek prospective injunctive relief. This is an exclusion that will continue to apply to him. And it doesn't matter whether we know exactly when he may be called for jury duty again. The fact that he had been called twice before is evidence that he's going to be called again in the future. And the evidence here is even stronger because Mr. Iglesias says she's going to vote again. She says voting matters to her. She votes because of her sister and, and what it means to her. I mean, I commend the court to read her deposition transcript. It starts at 33, 495 of the record. And by the way, she is asked later on, are you confident whether your ballot will be counted in the future, in future elections? And she says, no, that's on page 33565. So she's asked the question directly, is she confident her vote will be  She says no. So the district court finds that this is likely to happen again. And that's, that's just her. And I think for purposes of standing, she's a member of the organization. We have associational standing and we get to the merits. But I just think there's no way around that. And then when you get to the merits on the number matching provision, this is a story that looks like a standard 88 claim when you look at someone like Ms. Iglesias. She has to vote by mail. That's the only option available to her. She's paraplegic. So we know in Texas, this court has said voting in person is the norm. Voting by mail is the exception. Why does the exception exist? It exists for folks like Ms. Iglesias who have to do it. So then she tries to vote by mail. And because of the implementation of these provisions, this tiny box with confusing instructions and tiny font, she is not once but twice, my friends on the other side may have misspoken because the district court finds that page 42 in two separate elections, her application for ballot by mail is denied. And she makes requests. She calls her county officials multiple times. And again, this is all in her, it's in her deposition transcript. It's in the district court's finance. She calls and says, what's going on with this? And they just send her more forms. And her ballot is in county. So if you just drill down and look at that, that's an 88 claim. And I hear the response and some of the questions the court asked before, and Judge Oldham, you asked, well, how can you have a statewide injunction on that basis? Okay. I have two responses to that. First of all, we know that this problem extends well beyond Ms. Iglesias. There are other voters whose testimony the district court credited who had problems. Some of them managed to vote anyway, like Ms. Saltzman, although she needed to go to work to use the assistive technology there to access the ballot tracker, which the cure system that the court found was inaccessible to voters with visual disabilities. And some, like Ms. Guerrero-Mata, didn't. And we know there are thousands and thousands more, and there continue to be. But, again, if you have a problem with the scope of the remedy, that's not a merits issue. That's not a merits issue. That's not an issue about how we apply this court's ADA framework, which applies here when you talk about the failure to make modifications, the failure to do that affirmative obligation to think about how are we going to make sure that voters have access when you do something like design a mail-bout form. Well, it certainly is a justiciability issue with respect to redressability, right? I mean, you have to show at the threshold that there is something a federal court could do to fix your injuries, traceable to this particular defendant, to Secretary Nelson. And if the idea is Secretary Nelson is a proper defendant for a facial invalidity challenge, as the court has suggested, for example, in OCA Houston, I understand your point, right? But what I took at the very beginning of this, what I told you at the very beginning I thought was very helpful. I think it's great to take a step back and to forswear the facial invalidity injunction, because I think, like, that obviously narrows it. The problem is that you've been given away your best redressability argument as to this defendant, right? She has no power whatsoever over whether somebody can be prosecuted, for example, under the compensation provisions. She has no power whatsoever about the number matching, right? She administers team, but she's not the one disqualifying the ballots. And she has no power over any of the stuff with respect to, like, for example, under oath stuff, you know, you brought up a look at these findings of fact, which I happened to pull up. And like Mr. Cole stated the provisions offensive because it requires them to share a vote. No, it doesn't. It just says that the, you have to swear an open and safe perjury that somebody said he was eligible for assistance, which has been the rule long before SB1. So I feel like you're on the horns of a dilemma here where I appreciate again, getting rid of the facial injunction, but then I don't understand how your injuries are redressable as to this defendant. So I think it depends claim by claim. And, you know, on the point about Mr. Cole, I mean, this is the district court's findings that created those findings that this is, this is how voters reasonably understood these instructions, but you know, just, just stepping back and talking first about the compensation or excuse me, the number matching provision, the secretary designs the form. If the first of all, it's, it's entirely redressable. If the secretary just takes that tiny box off of the form. I mean, that is, that is redress for the injury. If the box was on the form, Mr. Iglesias won't have this problem. So I'm sorry, which box, the number matching box? No, yes, exactly. There's a little box that says with the confusing instructions and the tiny font that says put this number or if not put this number and, and doesn't tell people they can actually put in both numbers and, and, and that caused all these problems. And the secretary is directly the, the problem is directly traceable to the secretary's inclusion of this box on the form and redressable by her omitting it from the form. Did she make a choice to put the box there? I mean, the state law, number one, state law requires the box. And number two, it's, it requires the box for all mail-in ballots. So are you saying the remedy you want is for Ms. Iglesias to get a special mail-in ballot that doesn't have the box? No. And I, I, I, I see what you're saying, but there's a question that I'm talking about standing on remedy. There are many different things. The secretary could redesign the box. You could have a large, my friends talked about a large format application for ballot by mail. So there's the question of justiciability and standing. And I think we just, there's no question that we get there because the defendant is doing the thing that is causing the injury. And if she stopped doing the thing, then the injury would go away. I mean, that's what redressability is. Now, is that the remedy that we need is a narrow remedy possible to, to also prevent the injury? We are agreeing that it is. And my friends on the other side have suggested some as well. So let's do that. Let's affirm on liability. And then let's have a remedy that says, secretary of state, you need to take that affirmative obligation to make sure that voters have access to mail voting, including folks like Mr. Bases, who must vote by mail because of their disability. And let's redesign the application for a ballot by mail. I mean, why are we, why are, why are we sitting on our hands? Why not, why not get together and do this? And I think below the defendants didn't offer narrow remedies and, you know, but, but we are very welcome. We welcome that. We welcome. What was the, what was the ADA accommodation that you requested in the district board? So the, the, for purpose of establishing our claim on the merits, establishing liability, the reasonable modification was simply not, for example, on the number matching, not including the box on the floor.  And that was the only, that was the only accommodation you requested. And you didn't request it from Ms. Iglesias. You requested it for every voter in the state. In our post-trial briefing, we suggested some narrow remedies. We did. So that that's, I think, again, there's a question of remedy and there's a question of how do we prove up liability under the type of reasonable modification claim that we're talking about? What we need to show was there is a modification that is feasible, plausible. It's not created in this Barnett, for example, says this that is not creating some, some, you know, major new structure that's not imposing huge costs on the state. And so we pointed an extremely administrable modification, which is don't include the box on the floor, but that's different from do we propose for remedies, narrow remedies? And we did in our post-trial briefing and the other, you know, my friends on their side did not. So again, once you affirm on liability, because we met all of our marks, we centered the stories of folks who were denied access. And we showed that a reasonable modification would have given them access. My friends on their side did not come forward and prove up an affirmative defense around fundamental alteration. And I don't think they could have, because even if you just look at the provisions of SB1, there are so many ways in which it increased election security in Texas that are not an issue in this appeal at all. Even just looking at mail ballots. I mean, look at, look at section five, new ink signature requirements for the application for about by mail, new signature matching and security requirements for the, for the mail ballot. You've got new oath requirements for our sisters who drive multiple people to the polls. You have new independent poll watcher provisions in a, in section four, you have a prohibition on drive-through voting in section three. And there's a ton of this stuff. So even with respect to SB1, let alone the broader security architecture of Texas elections, we're talking about pinpoint modifications to particular ways in which the, this, this, the Texas elections were administered. They're specifically affecting voters with disabilities. And I would counsel, I appreciate the passion of the argument, but I'm worried that we're not having a particularly productive conversation because I'm trying to ask you some questions, but, and I understand you want to get at your points. I'm confident that presiding judge is going to let you do that, but can you please listen to this question? The Texas election code 1.022 specifically says that you can, if you, all you want is pinpoint accommodations, right? You can request them in accommodation or modification to any election standard practice or procedure mandated by law or rule that the individual is entitled to request under federal state law. So you have a freestanding right in individual cases for individual people like Vanessa Iglesias, not clear to me at all that she's the one you want to talk about because she says she's figured this out and it's going to be fine, but whatever you say, you've got others. So you can go for anything freestanding total has nothing to do with this case. So the question is number one, how does that interact with judiciability? How does that interact with respect to the, your obligation under the ADA to ask for a reasonable accommodation, which it doesn't sound like you did until your post-trial briefing. And then three, how does it interact with your remedy that you've asked for in the facial injunction? So those are three different buckets that I'm trying to get at it. One's judiciability, one is the merits of the ADA and the third is this big broad injunction. I don't understand. Yeah. I don't, and given the three buckets I'll try to hit all of them. And I think hopefully you'll let me know if I miss any of them. I don't think it interacts with just, just disability and I think we've talked about the factors we need to meet on judiciability in terms of injury, traceability, redressability. You're talking about section 108 of SB1. 108 says nothing here will, will prevent folks from requesting accommodations, but it doesn't say that accommodations will be granted. And then other provisions of SB1 say, unless a modification is expressly authorized in the statute, you can't grant it. And then it imposes civil penalties on local election officials, including I think up to loss of your pension. And this is 704 and 801 of SB1. And again, what the district court found was tons of testimony from election officials, folks from secretary of state's office. And the factual finding was that, that election officials, local election officials felt like their hands were tied, felt like they couldn't grant modifications. So that's, that's one piece of it, but let me talk about the merits more generally. The, there were numerous backing up the question for purposes of meeting our claimant merits. And Kadena says this, for example, it's, did the official know of the disability and its consequential limitations, either because there were requests or because it was open and obvious. And here there are three different buckets of evidence and factual findings the district court made that, that support that. First, numerous requests and complaints. And again, we talked, I talked about this already, but everyone from voters to counties, Harris County says,  can we let people, you know, use email or some other means to cure? Secretary says, no. The Department of Defense calls the secretary. So there are numerous ways in which people are letting the secretary know that the way this is being implemented is not working. That's one. Number two, these are provisions that target voting mechanisms used by voters with disabilities in particular, in particular, again, mail voting, for example, only available to certain voters and voters with disabilities, cheap among them. And third of all, the groups that the district court found, I think this is page 10 of the district court's decision found to, to whom the secretary and the elections division had outsourced their disability related obligations. We're saying, even as the, even as this legislation was being considered, these provisions are going to cause problems. So I think for all of those reasons, there were the factual finding that there was knowledge or open obviousness as well supported. And I want to point the court, for example, to a case like frame where there was no evidence and there was no evidence that every single sidewalk in the city of Arlington had been noted or there had been complaints about every sidewalk. There was a challenge by a number of voters. It wasn't a class action and who needed sidewalks to be accessible to, to what the city was doing with respect to constructing new sidewalks, just generally speaking. And, and the court said that they could proceed with that, with that, with that suit. So, and the one other point I would raise is that the election context and the court says this in Lamo in the fourth circuit, the election context is precisely the context where we need to be aware that folks may not have the ability to make individualized requests for accommodations, because once the election is over, it's done. There's a finite period and then it's over. So again, I think we just, we meet the standard under cabina. The district court's actual findings are not clearly erroneous. They're all over the opinion, page 10, 36, 37, 39, 40 to 43, 97, 98. That's just on the number matching provision. So the secretary knew and the local officials knew, and they felt their hands were tied. So again, I just think that is the finding. It's not clearly erroneous. And, and therefore we prevail on that aspect of the case. And that's sort of, that's sort of it. Then we get to the remedy question. And I think on remedy, if the court wants to take into consideration 108 and say, Hey, you know, it'd be a good remedy. Some guidance to tell local officials, they can make modifications that, you know, we have a factual finding. They think their hands are tied. So let's make sure they know that their hands are not tied. Let's make sure they know that they can make modifications to this provision. Let's make sure they know that they can allow people to cure in some other way to make sure that eligible voters who need to vote by mail because their disabilities do not have their, their ballots thrown out. I think that would be a perfectly reasonable way to proceed. And that's, that's consistent with perhaps the spirit in which the Texas legislature put 108 in there. But again, the factual findings are the way this was implemented with the, and this is the district court's finding. I know nothing, do nothing approach to ADA enforcement has resulted in, in local election officials, not making the modifications need to be made, even though, especially with respect to number matching provision, there were many calls. And there was clear knowledge that this was a problem and a problem for voters with visual and cognitive impairments in particular. Does that answer the court's question? Very helpful. Thank you. I'm not sure how much I, how much else I have to say on that provision. I'm happy to talk about the justiciability issues again, if the court would like and address them. I'll go back and look at my notes very quickly. I think I've answered the court's question with respect to the organizational standing piece. I do think that the ex parte Young analysis from Lupe four is a little different. There's daylight there, but as, as you said, I think the path of least resistance is probably to follow that as well. If the court isn't inclined to agree that there's something different about the compulsion restraint question there versus traceability to, to, to the secretary fear for purposes of the vote harvesting provisions. You know, one other point I would, I would raise, and this goes to something that my friend, Mr. Mr. Gore said, he pointed out that folks successfully vote. And, you know, that is true that there are a number of folks who despite the, the barriers imposed by the implementation of these provisions, you know, folks were able to successfully vote in some cases. If it takes you two days to fill out a mail ballot, like it did for Ms.  Halverson, if you have to vote in physical pain, if you have to hunt around for assistive technology to get the cure process to work for you, I mean, we know from cases like Lane and others that you can't, there is still a problem under the ADA and there's still a barrier to access if you have to crawl up two flights of stairs. And for some voters, that's what happened here. So we are not saying that you should, that, that you need necessarily to affirm the broad injunction here, but I do think we need to affirm on liability, at least as to those provisions where we get past the justiciability issues, at least as to number matching provision where I think that's the, that's the strongest ground for us to get past. And then once you do, you can remand for remedial hearing that we didn't have the first time around. I mean, maybe we can take up some of the suggestions that my friend, Mr. Ordner has put before the court today, and we can get some real remedies in place for voters in Texas who need them. And, and make sure that all people regardless of disability in Texas can, can, can get their ballots counted. That is what we were asking for at the end of the day. All right. Thank you, Mr. Spitzky, Mr. Ordner for rebuttal. Okay. Thank you, your honors. I want to just get right into addressing the plaintiff's proposal that the court should affirm on the merits and send back for a remedy. That's just not proper here. First of all, plaintiff's burden under title two of the ADA is to propose a reasonable modification or accommodation. And then the state gets a chance to explain why that's not a reasonable accommodation or modification with evidence here. They didn't propose anything either to the local officials, which is the first requirement or even in the court, even here today, they haven't said what accommodations they want other than just not having the ID requirement on the ballot or perhaps having it in a larger font, which if they would request that and counties did provide inserts, they provided everything they could to make this, this provision noticeable to ensure that people were able to comply with it. And again, the idea that the election officials don't know that they can provide accommodations. I think that, you know, just the language of section 1.0022 of the code, it clearly says a provision of this code may not be interpreted to prohibit or limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification to any election standard practice or procedure mandated by law or rule that the individual is entitled to request under federal or state law. The legislator expressly protected the right to ask for an accommodation when enacted SB1. I don't know how clear the legislator could have been about that. And there's evidence in the record that people did ask and received accommodations, whether that was in Cameron County going to voters homes, whether that was providing assurance on the phone to individuals, like I believe it was Ms. Landry who the administrator of Harris County told her on the phone, the kind of assistance you want, the queuing you want is allowed. This is not impermissible like that kind of clarification inserts that they offered. I don't know. There obviously are accommodations and actually the whole process of mail voting is already an accommodation and the state is making it as accessible as possible. But so going to this idea though, that you just go say, well, there's a violation and therefore we're going to go back down to a remedy that inverts the burden. The ADA doesn't do that. That's the kind of systemic disparate impact theory that the district court seemed to embrace with the Pion site that, you know, there's something wrong here. Therefore we're going to just aggregate say we need a remedy. The ADA is about the title two of ADA is about individual needs, individual accommodations, individual requests for those needs. And so it's just the improper to say, well, there's some kind of problem we're going to go back down to solve a remedy that's the plainest burden under title two. And frankly, they raise the idea of the no nothing, do nothing approach. And the district court, I think was clearly erroneous in that finding when there's all this evidence of all the approaches that the state, the counties in the state did, did adopt to do so. I do want to address briefly judge Oldham's point. I think it's important about the injunction for the 6.06 and 7.04, the ID, the harvesting provision and the paid assistance only running against the secretary. That is a really significant addressability problem. And the loop a four decision doesn't actually address that. It only basically the court said for the provisions where we find there is an enforcement connection with the secretary, there is also standing. It didn't say for other, the provisions that are already did not find an enforcement connection that there is standing under under its decision. And there is a serious problem of addressability where all that they're saying is the secretary, you can't put this work, this on the form, but it's still required under state law to, to be able to have your ballot counted. They also pointed to the kind of speculative fears that people had that we'll have to disclose too much information to their assisters, but there's not evidence in the record of a single vote being denied because of the assistance provision in, in sense of that someone didn't give enough information or the assister wasn't sure enough. And therefore the vote didn't count. This is pure speculation under this court's decision and loop a three. Ms. Iglesias. I, if I said she was denied once, I apologize. There were two elections where she had issues, but the key is that the issue that she had was the, she just forgot to put her ID number on the ballot on the, in the space provided for it. There's no indication she didn't have it. She now knows that she has to put it on the ballot to look for it. And this, the ballot, you know, this information is readily accessible to voters. The state has made everything they can and the counties to, to let people update their information. And that's really different from cases like Crawford or Heinz, where there's a courtroom, a courthouse accessibility, where this County promised we'll fix it. They didn't do anything about it. Here. The state has been doing everything they can to lower barriers, provide accountability, provide access. And there really is just no, no injury to play this on their vote and their members in this case. Thank you. Thank you, Mr. Orton. Your case is under submission and the court is in recess under the usual order.